IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| STEPHANIE PACLEY, | ) | CASE NO. 1:16CV2329 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE BENITA Y. PEARSON |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Stephanie Pacley ("Pacley") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

As set forth more fully below, the decision by the Administrative Law Judge ("ALJ") is incomplete.  The ALJ did not sufficiently evaluate Pacley's severe impairments, connective tissue disorder and fibromyalgia, and did not explain his credibility assessment.  On remand, the undersigned recommends that the ALJ reevaluate all the evidence in light of the pertinent legal authority and issue a new decision beginning at Step Three of the sequential review.  Accordingly, the undersigned recommends that the Commissioner's decision be **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.

**I. Procedural History**

1

On November 1, 2013, Pacley filed applications for DIB and SSI, alleging a disability onset date of March 27, 2013.  Tr. 144, 148.  She alleged disability based on a neck injury.  Tr. 169.  After denials by the state agency (Tr. 95, 96), Pacley requested an administrative hearing.  Tr. 105.  A hearing was held before Administrative Law Judge ("ALJ") George D. Roscoe on August 11, 2015.  Tr. 28-79.  In his August 24, 2015, decision (Tr. 15-22), the ALJ determined that there are jobs that exist in significant numbers in the national economy that Pacley can perform, i.e., she is not disabled.  Tr. 20.  Pacley requested review of the ALJ's decision by the Appeals Council (Tr. 9) and, on July 23, 2016, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 2-5.

## II. Evidence

### A.  Personal and Vocational Evidence

Pacley was born in 1969 and was 44 years old on the date her applications were filed.  Tr. 144.  She previously worked as a general clerk, insurance clerk, receptionist, and telephone operator.  Tr. 74.  She last worked in March 2013.  Tr. 179.  She has two and a half years of college.  Tr. 34-35.

### B.  Relevant Medical Evidence

On March 27, 2013, Pacley was involved in a car accident.  Tr. 244.  She was taken to the emergency room.  Tr. 262.  She had x-rays of her chest and left shoulder and a CT scan of her cervical spine, which showed normal findings.  Tr. 264-267.  Pacley was diagnosed with a cervical muscle strain and multiple contusions and discharged with prescriptions for diclofenac sodium tablets and a muscle relaxant for pain and spasms.  Tr. 267-268.

Pacley followed up with her primary care physician, Anthony Ignocheck, M.D., on April 2, 2013.  Tr. 408.  She reported that, while she was driving, she was struck by another car on the

2

passenger side of her car and she experienced primarily neck pain.  Tr. 408.  The muscle relaxant she had been given made her drowsy so she had not taken much of it and she had not filled her diclofenac sodium prescription.  Tr. 408.  She complained of pain on the right side of her neck and shoulder area, worse with movement, and worse, 9/10, when she got up in the morning.  Tr. 408.  She had been taking naproxen, which she had been previously prescribed, and was using ice and heat on her neck.  Tr. 408.  She also noticed occasional tingling on the outer area of the right side of her arm.  Tr. 408.  Upon exam, she was in mild distress, had tenderness to palpation in her right paraspinous muscles and shoulder girdle, had swelling and spasms in the area, and her range of motion was limited due to pain.  Tr. 410.  Her arm strength was intact and symmetric.  Tr. 410.  Dr. Ignocheck diagnosed cervical muscle strain.  Tr. 410.  He started Pacley on methocarbamol (a muscle relaxant) and advised that she continue taking naproxen.  Tr. 410.  He recommended stretching, isometric strengthening exercises, and a follow-up visit in two weeks.  Tr. 410.  At the time, Pacley was on hydroxychloroquine (Plaquenil), a drug used to treat symptoms of Lupus.  Tr. 409.

Pacley returned to Dr. Ignocheck on April 12, 2013.  Tr. 402.  She reported that she still experienced significant pain in her neck when she turned to the left and less pain when she turned to the right, pain that radiated down her back, and occasional tingling in her right upper arm.  Tr. 402.  She did not notice any muscle weakness.  Tr. 402.  Upon exam, she was in mild to moderate distress with neck pain, had tenderness and spasm on both sides of her neck and trapezius muscles, mild tenderness in her shoulders, and a limited range of motion in her neck.  Tr. 404.  Dr. Ignocheck stated that, given her lack of improvement over the past two weeks, he would refer Pacley to physical therapy for further evaluation and treatment.  Tr. 404.  He wrote,

3

"She will stay off work next week.  We'll hopefully get her back to work at least half-time the following week."  Tr. 404.

Shortly thereafter, Pacley had a physical therapy evaluation.  Tr. 244.  She exhibited decreased range of motion in her neck, tenderness in her neck and upper trapezius muscles, and she was unable to tolerate repeated movement testing.  Tr. 250.  She described her functional limitations with activities of daily living as difficulty turning her head, looking down, sleeping, and performing household chores; she also had difficulty sitting and looking at a computer as required by her job.  Tr. 247.  The evaluating therapist stated that, although Pacley's current job may be described as a sedentary or light exertional job, her limited range of motion, pain level, and ease of irritability made it difficult for her to resume full duty essential job tasks in the short term, i.e., in one week.  Tr. 250.

On May 6, 2013, Pacley reported to Dr. Ignocheck that she was on furlough from her job until November.  Tr. 322.  She had not noticed improvement in her neck pain yet after two weeks of physical therapy.  Tr. 322.  Her pain was worse in the mornings and naproxen helped.  Tr. 322.  Dr. Ignocheck commented that the etiology of Pacley's neck and upper thoracic pain and paraspinal tenderness was unclear; the burning component of Pacley's pain suggested the possibility of nerve irritation and some of the pain described as achy may be more musculoskeletal.  Tr. 323-324.

On May 30, 2013, Pacley saw Dr. Ignocheck complaining of neck pain and some associated weakness and fatigue.  Tr. 315.  The pain had changed and was more a problem on her right side.  Tr. 315.  It hurt when she tried to sleep until she got her head in a particular position and she also experienced occasional numbness in her fingers.  Tr. 315.  She reported that she was able to do daily activities with some difficulty, moving more slowly while cleaning

4

her house and attending to personal hygiene as these activities may cause pain.  Tr. 315.  She also reported that she tired quickly and had to stop frequently to rest.  Tr. 315.  She was taking naproxen.  Tr. 315.  Upon exam, she was in moderate distress, was tender to palpation in her neck and shoulders (right slightly more than left), had a limited range of motion in her neck, and slightly diminished grip strength in her right compared to her left.  Tr. 317.  Dr. Ignocheck observed that the severity of Pacley's pain had not changed and that it was placing significant limitations on her activities of daily living.  Tr. 317.  He stated that, due to her fatigue requiring frequent breaks, she "really is not ready to return to her job yet."  Tr. 317.  He opined that her fatigue may be "multifactorial."  Tr. 317.  He ordered an MRI of her cervical spine and recommended she try ibuprofen to see if it worked better than the naproxen.  Tr. 317.

After two months of physical therapy, Pacley was discharged on June 7, 2013, because she did not show any improvement, either subjectively or objectively.  Tr. 235.

A June 13, 2013, cervical spine MRI showed mild spondylosis.  Tr. 260.

On July 11, 2013, Pacley saw Dr. Ignocheck for a follow-up visit.  Tr. 309.  She continued to have neck pain, still rated 8/10, worse on the right side and radiating down into her right shoulder and arm.  Tr. 309.  She was taking naproxen but was not taking her tramadol because it made her drowsy.  Tr. 309.  Dr. Ignocheck explained that "any pain medication is going to cause some drowsiness" and that she needs to try the tramadol, even if she just tries half a pill.  Tr. 309.  Upon exam, she was in mild distress, with pain and tightness in her neck and shoulders, right worse than left.  Tr. 309.  Arm strength was intact and fairly symmetric.  Tr. 311.  Dr. Ignocheck opined that the etiology of her severe pain was unclear and that he would await her upcoming pain management and rheumatology appointments.  Tr. 311.  He opined that her

pain limited her activities enough "that she really cannot go back to work on [an] unrestricted basis."  Tr. 311.

On July 18, 2013, Pacley visited a pain management clinic for her neck pain, which she rated 8/10 that day and as aching and burning, the right side worse than left, and radiating into her arms.  Tr. 398.  Her pain was aggravated by sitting up for too long and alleviated by lying down and "topicals."  Tr. 398.  She reported trying the following medication: Flexeril, Naprosyn, and tramadol.  Tr. 398.  She stated that physical therapy did not help her pain, but that it did improve her function.  Tr. 389.  Upon exam, she was in no apparent distress, had a supple neck, full strength in her arms and legs, a slight decrease in the range of motion in her neck, especially with ear to shoulder bilaterally, and was tender to palpation in the right paraspinal region of her cervical spine.  Tr. 389.  The plan was cervical epidural steroid injections, extended release tramadol, and Celebrex.  Tr. 389.

On August 13, 2013, Pacley returned to Dr. Ignocheck complaining of shortness of breath when sitting or walking but better when lying down.  Tr. 302.  She denied chest pain and reported passing black stool the day before and experiencing some nausea.  Tr. 302.  She denied taking any new medications.  Tr. 302.  She also reported fatigue and sleeping 14 hours.  Tr. 305. Dr. Ignocheck ordered blood tests.  Tr. 305.

On August 20, 2013, Pacley returned to Dr. Ignocheck for a follow-up visit.  Tr. 296. She reported that her shortness of breath had improved "pretty quickly" over a couple of days, although she also experienced occasional palpitations and experienced shortness of breath at those times.  Tr. 296.  She denied anxiety, depression, hopelessness, helplessness, anhedonia, or social withdrawal.  Tr. 296.  She was fatigued and stated that she could not sleep at night.  Tr. 296.  Her blood work was fairly normal and Dr. Ignocheck stated that he would have considered

that she had an anxiety attack but for the fact that Pacley did not report symptoms of anxiety.  Tr. 298.

On September 11, 2013, Pacley saw Dr. Ignocheck for pain on the right side of her neck that radiated into her shoulders and upper back.  Tr. 290.  Her pain was still 8/10.  Tr. 290.  She had been taking the extended relief tramadol once a day, but it caused her to be "very sedated."  Tr. 290.  If she has to do things during the day she will wait until later in the day to take it.  Tr. 290.  It provided some relief but not a lot.  Tr. 290.  Over the last couple of months, she had begun to feel more stressed and down.  Tr. 290.  She could maintain self-care but could no longer do housework and some days she could not cook.  Tr. 290.  She found it hard to concentrate.  Tr. 290.  Dr. Ignocheck noted that her symptoms date back to a car accident.  Tr. 290.  Upon exam, she was in moderate distress.  Tr. 291.  She had tenderness to palpation in the right side of her neck, right trapezius muscle, and right upper back.  Tr. 291.  She made good eye contact and was appropriately dressed and groomed; Dr. Ignocheck also wrote, "Her mood was a little down and affect perhaps a little flat."  Tr. 292.  He prescribed an antidepressant (Prozac) and advised her to contact pain management about her symptoms from the tramadol and to return in six weeks.  Tr. 292.

On October 23, 2013, Pacley saw Dr. Ignocheck for a follow-up visit.  Tr. 284.  She reported that she had gotten an injection in her neck on October 7, which increased her pain for a few days, but that now her pain was less intense, "more diffuse," and was currently a 7/10.  Tr. 284, 391.  She was tolerating her Prozac "quite well."  Tr. 284.  Her mood was much better, she was less irritable, and she had more patience and enjoyment in things.  Tr. 284.  The tramadol bothered her stomach and she could not take it unless she was staying at home because it made her feel drugged and she had to stay in bed all day when she took it.  Tr. 287.  She had an

appointment with a different pain management doctor to get a second opinion.  Tr. 284.  She was scheduled to return to work in early November but expressed doubt that she could because of her pain.  Tr. 284.  Upon exam, she was in no acute distress but mild to moderate chronic distress.  Tr. 286.  She had tenderness to palpation in her neck with palpable muscle tightness and decreased motion and increased pain after extension.  Tr. 286.  Her arm strength was intact.  Tr. 286.  Her mood and affect were fairly normal.  Tr. 286.  Dr. Ignocheck opined that she "may need some work hardening training prior to going back to work."  Tr. 286.

On October 29, 2013, Pacley was evaluated by Kelly Kopkowski, D.O., for her right sided neck pain that she experienced since her March 2013 car accident.  Tr. 350.  Pacley reported that, prior to her epidural injection, her pain was 7/10 and that it felt worse after the injection.  Tr. 350.  She reported being on tramadol but stated that she is not functional on it and cannot take it.  Tr. 350.  She was taking naproxen and used heat and cold. Tr. 350.  She denied radicular pain.  Tr. 350.  She denied gastrointestinal symptoms, muscle weakness, and numbness, and reported sleep disturbances, myalgia and arthralgia.  Tr. 351.  Upon exam, she appeared normal and alert, had tenderness upon palpation in her neck posteriorly and over the entire right side of her cervical spine and scalene muscles, abnormal flexion, normal extension, and painful left-sided lateral bending.  Tr. 351.  She had a normal sensory exam, muscle tone, and motor strength.  Tr. 351.  Dr. Kopkowski diagnosed Pacley with cervicalgia and myofascial pain syndrome, and prescribed a muscle relaxer (baclofen) to use as needed.  Tr. 351.

Pacley returned to Dr. Kopkowski on November 12.  Tr. 349.  The baclofen was helping "a bit" with her muscle pain without making her drowsy.  Tr. 349.  She had stopped taking the tramadol and stated that she was hesitant to get a trigger point injection.  Tr. 349.  Dr.

Kopkowski increased her baclofen and remarked that, at the next visit, they will discuss a return to physical therapy or trigger point injections.  Tr. 249.

On November 22, 2013, Pacley returned to Dr. Ignocheck's office complaining of lip discoloration.  Tr. 279.  She also complained of bad headaches, three that she had had that week, that start behind her right eye and radiated throughout her head.  Tr. 279.  Excedrin helped.  Tr. 279.  She also described light sensitivity, dizziness, and some nausea.  Tr. 279, 281.  Her neck was still stiff and bothersome and the baclofen was not providing much relief.  Tr. 279.  Upon exam, she appeared well, had a full range of motion in her extremities, decreased extension and lateral tilt of her neck, and tenderness upon palpation of her posterior cervical muscles.  Tr. 279. She was diagnosed with headache related to muscle tension and neck pain and the cause of her abnormal skin pigmentation was suspected to be her Plaquenil.  Tr. 281.  It was recommended that she follow up with her rheumatologist.  Tr. 281.

On December 16, 2013, Pacley saw Dr. Ignocheck complaining that her skin hurt and that it felt like it was on fire.  Tr. 528, 531.  She had areas of skin hyperpigmentation, muscle aches, and diffuse tenderness.  Tr. 528.  She reported taking tramadol but was groggy and "less functionable" on it.  Tr. 529.  Upon exam, she was in moderate distress and exhibited "diffuse tenderness to palpation from the neck down [which] included both typical fibromyalgia trigger points and pretty much almost everything in between."  Tr. 530.  She had a couple of small hyperpigmented areas on her left posterior shoulder up to a ½ centimeter in diameter that looked like bruises.  Tr. 530.  Dr. Ignocheck diagnosed myalgia and skin tenderness and noted that she has Lupus, for which she takes Plaquenil.  Tr. 530-531.  He opined that the etiology of her myalgia and skin tenderness was unclear but could be related to her Lupus or it could be

fibromyalgia.  Tr. 531.  He started her on Mobic and Neurontin and recommended that she see her rheumatologist about her symptoms.  Tr. 531.

On January 24, 2014, Pacley followed up with Dr. Kopkowski and reported that her pain was a bit better.  Tr. 347.  She had started taking tramadol again and was tolerating it well; she had thus stopped taking the baclofen because she was afraid to take both.  Tr. 347.  She reported that she still had muscle spasms but that her range of motion was still improving.  Tr. 347.  Upon exam, Pacley had normal cervical spine flexion and extension, albeit with pain upon rotation, and was unable to squat and toe walk due to leg pain.  Tr. 347.  She had good forward lumbar spine flexion and had multiple tender points.  Tr. 347.  Dr. Kopkowski diagnosed Pacley with cervicalgia and myofascial pain syndrome.  Tr. 347.  She restarted her on baclofen, to take with the tramadol, and advised her to go to a rheumatologist for evaluation.  Tr. 347.

On January 29, 2014, Pacley saw Dr. Ignocheck for a routine follow-up.  Tr. 630.  He explained in her history that, at her last visit, she had an exam that was "in part suggestive of fibromyalgia, but actually with more diffuse soft tissue tenderness to palpation."  Tr. 630.  He reiterated that she had started taking Mobic and Neurontin, in addition to her tramadol, and that she was doing well with those medications.  Tr. 630.  Her pain was about 50% better.  Tr. 630.  She had seen a rheumatologist, who had recommended she try to minimize the tramadol and use Mobic instead; there was concern that, because some of her medications are serotonergic, the cumulative effect may contribute to serotonin syndrome.[1]  Tr. 630.  She had run out of her extended release tramadol and had been taking 4 short acting tramadol a day; Dr. Ignocheck stated that once a day extended release tramadol use would be preferred.  Tr. 630.  Pacley also complained of problems with depression (worsening mood, more irritable, tearful, feeling down,

---

[1] Serotonin syndrome is caused by hyperserotonemia, which may be due to taking medication combinations that increase serotonin levels.  Symptoms are variable but include mental status changes, autonomic hyperactivity, and irregular muscular movements.  *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 1847.

social withdrawal).  Tr. 630.  She mentioned her gastrointestinal reflux issue that she had reported being diagnosed with, stated that she had been prescribed Prilosec for it, but that she had not taken it lately and that she preferred Pepcid.  Tr. 630.  Upon exam, Pacley was in minimal acute distress and had tenderness to palpation in multiple tender points, including her neck, upper and lower back, pelvic area, upper chest, and knees.  Tr. 632.  Dr. Ignocheck noted that she was doing better with the combination of tramadol and Neurontin, seemed reasonably comfortable with it, although she still had pain, and that she had run out of her Mobic and would restart that.  Tr. 633.  He warned Pacley about serotonin syndrome symptoms, remarked that she did not have any at that time, noted that her mood symptoms were worse, and increased her Prozac.  Tr. 633.  He diagnosed her with myalgia, skin tenderness, fibromyalgia, dysthymia, and GERD.  Tr. 633.

On February 12, 2014, Pacley returned to Dr. Ignocheck complaining of right arm pain after she was hit by a car while driving her car a few weeks prior.  Tr. 519.  She had gone to the emergency room later that day, where she was diagnosed with musculoligamentous strain.  Tr. 519.  Her pain had gotten worse for a few days but it was now getting slowly better.  Tr. 519.  She currently had "moderately severe exacerbation of her pain," it hurt with certain movements, and "there may be a little tenderness in the area."  Tr. 519.  She reported no increasing weakness, numbness or tingling in her right arm.  Tr. 519.  She was taking her prescribed medications and "otherwise she had no acute complaints."  Tr. 519.  Upon exam, she was in moderate acute distress and had some tenderness and limited range of motion in her right arm.  Tr. 520-521.  Dr. Ignocheck commented that her right arm pain was gradually improving but that, due to her fibromyalgia, it may take longer for her to recover.  Tr. 521.  He also observed that she had

insomnia, also likely related to her fibromyalgia.  Tr. 521.  He increased her Prozac to help with

her insomnia and recommended rotator cuff exercises for her right arm and shoulder.  Tr. 521.

On March 13, 2014, Pacley returned to Dr. Ignocheck for a follow up visit.  Tr. 511.  She

reported that her shoulder pain was better and "pretty much back to baseline."  Tr. 511.  She did

have some shoulder pain that day "but this is different and more of a flare of her fibromyalgia

symptoms."  Tr. 511.  She also had increased fatigue and sometimes did not get to sleep until 4

a.m.; every now and then she would sleep all day.  Tr. 511.  She performed her activities of daily

living, but more slowly, and on days when she did more activity, like going to the grocery store,

she would be more fatigued the next day.  Tr. 511.  She also noticed trouble concentrating.  Tr.

511.  The increased Prozac helped her mood.  Tr. 511.  Upon exam, she was in mild distress and

had some tenderness to palpation around her shoulders and back.  Tr. 513.  Dr. Ignocheck opined

that Pacley's insomnia was related to a combination of her mood symptoms and fibromyalgia,

and noted that she was on a relatively low dose of Neurontin and had not tried Lyrica.  Tr. 514.

He recommended exercises and discussed the possibility of light therapy to help with her

sleeping pattern.  Tr. 514.

On April 25, 2014, Pacley was evaluated for fibromyalgia by rheumatologist, Yong

Hwang, M.D., upon a referral from Dr. Ignocheck.  Tr. 473, 476.  Dr. Hwang recounted Pacley's

reported medical history, including the following: her diagnosis of Lupus sometime in the past,

prior to her March 2013 motor vehicle accident; her increasing neck and back pain, arthralgia

and myalgia, and worsening fatigue after her accident; Dr. Ignocheck's fibromyalgia diagnosis;

Pacley's medications; and her present symptoms, including continuing intermittent dizziness,

burning pain over her tongue, intermittent palpitations, occasional headaches and paresthesia,

occasional muscle weakness and sleep disturbance, sweating, and moderate fatigue.  Tr. 476,

477.  She denied depression or significant medication side effects.  Tr. 476, 477.  Upon exam, she was in no acute distress.  Tr. 477.  She had normal skin; bilateral tenderness to her elbows, bicep tendons, greater trochanteric bursa, iliotibial band, and knee tendons; positive elbow loading test for hypermobility; and scored a five on the Beighton Hypermobility test.  Tr. 478.  Dr. Hwang opined that Pacley's diagnosis of Lupus needs to be revisited, based on her lab work results, and that she exhibits joint hypermobility which could explain her diffuse symptoms.  Tr. 479.  He stated that she meets the criteria for fibromyalgia, but that underlying hypermobility syndrome could be contributing to her diffuse pain and fatigue.  Tr. 480.  He recommended discontinuing tramadol, based on side effects of drug interaction, and recommended taking Mobic for pain and increasing Neurontin as tolerated.  Tr. 480.  He also decreased her Plaquenil dosage because of her lean body weight.  Tr. 479.  Based on Pacley's score of 5 on the Beighton Test, Dr. Hwang diagnosed her with hypermobility syndrome, which can cause symptoms such as diffuse muscle pain, joint swelling, dizziness, palpations, GERD, easy bruising, anxiety, increased psychological stress, and sweating.  Tr. 480.  He noted that it is common for hypermobility syndrome patients to develop severe myalgia and arthralgia after a minor injury such as Packley's whiplash injury from her car accident.  Tr. 480.  He referred her to physical therapy, consisting of three stages, if her pain is not well controlled.  Tr. 480.  She was to follow up in three months.  Tr. 481.

On July 7, 2014, Pacley saw Dr. Ignocheck complaining of increased neck pain, described as burning and aching, for the past two weeks.  Tr. 502.  It was worse in the morning and when she lifted or exerted herself.  Tr. 502.  Medications helped "a little bit."  Tr. 502.  She regularly took tramadol.  Tr. 502.  She denied numbness or tingling in her hands or increased weakness.  Tr. 502.  She reported that she had not scheduled any of the physical therapy that was

recommended by Dr. Hwang.  Tr. 502.  Upon exam, she was in mild to moderate apparent distress.  Tr. 504.  Her neck was tender to palpation, more so on the right; her shoulder girdle muscles showed significant tenderness to palpation; and she had a decreased range of motion in her neck.  Tr. 504.  Her arm strength was intact and symmetric, albeit "There may be a slight limitation due to discomfort," and her gait was unremarkable.  Tr. 504.  Dr. Ignocheck referred Pacley to physical therapy for her neck and encouraged her to begin the physical therapy recommended by Dr. Hwang.  Tr. 504.  She was to follow up in four weeks.  Tr. 504.

In January 2015, Pacley established care with Jayanthia Alagarsamy, M.D., after moving to Ohio.  Tr. 671.  Pacley reported that she was concerned about weight gain, which she attributed to her medications.  Tr. 671.  She also complained of palpitations, joint pain and joint swelling and denied sweating, dizziness, lightheadedness, shortness of breath upon exertion, depression, numbness, and tingling.  Tr. 671, 673.  Upon exam, she was not in pain.  Tr. 673, 674.  Her gait was normal as was her mood, affect, attention span and concentration.  Tr. 674.  She had no swelling in her hand joints.  Tr. 674.  Dr. Alagarsamy referred Pacley to rheumatology and continued her medications, although he switched her depression medication from Prozac to Cymbalta.  Tr. 674-675.

On April 9, 2015, Pacley returned to Dr. Alagarsamy.  Tr. 685.  She still had not seen a rheumatologist.  Tr. 685.  She complained of anxiety and insomnia, the latter of which caused her to get only fragmented sleep and then feel tired throughout the day.  Tr. 685.  She also complained of joint pain and muscles aches.  Tr. 687.  She denied headaches, numbness and tingling.  Tr. 687.  Upon exam, she was not in pain.  Tr. 687-688.  Her gait was normal, she had no swelling of her hand joints, and she had no neurological deficits.  Tr. 688.  She was alert, cooperative, and anxious.  Tr. 688.  Dr. Alagarsamy again referred her to rheumatology and

added Sertraline for anxiety.  Tr. 689.  He suspected that her insomnia was secondary to her anxiety.  Tr. 689.

On June 22, 2015, Pacley saw rheumatologist Scott Berg, D.O., for a consultation for her undifferentiated connective tissue disease and fibromyalgia.  Tr. 694.  She reported fatigue for a year and a half and exhaustion after exercise.  Tr. 694-695.  She has been taking Plaquenil since 2013.  Tr. 695.  She reported "polyarthralgia of her wrists and fingers without the definite swelling but she feels like her joints are swollen."  Tr. 695.  She also stated that she had joint stiffness that lasted a few hours, getting worse as the day progressed.  Tr. 695.  She reported chest pain, shortness of breath at rest, photosensitivity, and headaches.  Tr. 695-696.  She denied numbness, weakness, and depression.  Tr. 696.  Upon exam, she had normal skin, respiratory, cardiovascular and neurological systems.  Tr. 696.  She had soft tissue tender points but full muscle strength in her arms and legs and her cervical spine showed a full range of motion and no tenderness to palpation.  Tr. 696.  All the joints in her upper and lower extremities were normal, without tenderness, swelling, or reduced range of motion.  Tr. 697.  Her manual muscle testing was normal.  Tr. 697.  Dr. Berg wrote that Pacley had brought none of her records to verify any specific evaluation that she had had done, and that her present physical examination was "rather unremarkable."  Tr. 697.  He instructed Pacley to obtain her prior records, and that, once he reviewed her records, he would consider additional diagnostic and therapeutic options.  Tr. 697.  He diagnosed her with a history of fibromyalgia and Reynaud's phenomenon.  Tr. 698.

### C. Medical Opinion Evidence

#### 1. Dr. Kopkowski's Opinion

On January 22, 2014, Dr. Kopkowski completed a "Medical Source Statement of Ability to Do Work-Related Activities."  Tr. 341-347.  Dr. Kopkowski opined that Pacley could

occasionally lift up to 50 pounds and carry up to 20 pounds.  Tr. 341.  Without interruption,
Pacley could sit for four hours, stand for two, and walk for one hour; in a single workday she
could sit for a total of six hours, stand for three, and walk for three.  Tr. 342.  She could never
stoop, kneel, crouch, or crawl, but could occasionally climb ladders or scaffolds and could
frequently balance and climb stairs and ramps.  Tr. 343.  With her right hand, she could
occasionally reach, push and pull and frequently handle, finger, and feel; with her left had she
could frequently do all these activities.  Tr. 344.  Dr. Kopkowski explained that these assessed
limitations were due to the MRI of her cervical spine showing mild spondylosis, and, in her right
upper extremity, pain with movement and increased numbness and tingling with prolonged use.
Tr. 344.  Dr. Kopkowki stated that these limitations have not lasted and were not expected to last
more than 12 consecutive months.  Tr. 345.

### 2. State Agency Reviewing Physician

On December 5, 2013, state agency physician Paul Fox, M.D., reviewed Pacley's records.
Tr. 85.  Regarding Pacley's residual functional capacity, Dr. Fox opined that Pacley was capable
of lifting 50 pounds occasionally and 25 pounds frequently; standing, sitting, and walking for six
hours of an eight-hour day; pushing and pulling without limitation; and that she should avoid
concentrated exposure to extreme cold, humidity, vibration, and workplace hazards.  Tr. 84-85.

### D.  Testimonial Evidence

### 1.  Pacley's Testimony

Pacley was represented by counsel and testified at the administrative hearing.  Tr. 31-71.
She lives with her boyfriend and two teenage children in a second story apartment.  Tr. 32.  The
apartment building has no elevator; she must climb the stairs to get to her apartment.  Tr. 32.
She has a driver's license and drives.  Tr. 34.

Pacley stopped working in March 2013 because she was in a car accident.  Tr. 40.
Another driver pulled out of a parking lot and hit Pacley's car as she was driving down the street.
Tr. 41.  She was taken to the emergency room and discharged the same day.  Tr. 41.  The legal
outcome of that accident had not been resolved at the time of the hearing.  Tr. 41.

Pacley stated that she cannot work because of excruciating pain, which is rated 7-8 out of
10 on a regular basis.  Tr. 42.  Her pain is 24 hours a day, 7 days a week, and is in her entire
body.  Tr. 42-43.  She takes the following medications: tramadol extended release, Flexeril,
Prozac, Prilosec, ferrous sulfate, Excedrin, aspirin, meloxicam, and gabapentin.  Tr. 43.[2]  Her
medication helps some of the pain subside, but never takes it completely away.  Tr. 44.  She is
not sure if her debilitating fatigue is from her illnesses or her medication or both.  Tr. 44.  She
does not wear a brace, use a cane or crutches, or use a TENS machine.  Tr. 45.  She is currently
in physical therapy.  Tr. 45.  She did not have surgery recommended but she has had epidural
steroid shots.  Tr. 45-46.

Pacley testified that she cannot squat or stoop.  Tr. 49.  On a bad day, due to joint pain
and muscle weakness, she cannot lift a gallon of milk.  Tr. 50.  Her most comfortable position is
lying down, although she has to change positions often to get comfortable.  Tr. 58.  When she
engages in "normal activity, like, outside of the house or anything," it makes her sick for a week
or so from pain and fatigue and she can't get out of bed.  Tr. 60.  On average, she has three or
four bad days a week.  Tr. 60.  It is hard for her to walk because her legs feel like lead and it is
painful.  Tr. 60.  She has difficulty with stairs—she was unable to find a first floor apartment—
and her boyfriend helps her go up and down.  Tr. 61.  She can't sit for long periods because her

---

[2] Pacley did not mention Plaquenil, which she had listed on her medication sheet at Exhibit 9E (Tr. 212) that was
referenced by the ALJ at the Hearing (Tr. 43).

legs get jittery and she can't find a comfortable position and she ends up going back to her bed. Tr. 62.

She still has pain in her neck and trapezius muscles, although her medications help, but sometimes her neck hurts badly and feels like it weighs a thousand pounds: it is hard for her to hold it up and she then has to lie down.  Tr. 62.  She also gets headaches and has light sensitivity. Tr. 62, 65.  She also has difficulty moving her neck.  Tr. 62.  It hurts when she reaches too far, especially with her left hand, and she gets tingling in her arms and hands.  Tr. 62.  She has difficulty writing or typing because it hurts to do so.  Tr. 64.  She still gets muscle spasms in her legs and neck.  Tr. 64.  She has muscle weakness all the time.  Tr. 64.

On bad days Pacley sleeps all the time but on good days she cannot sleep.  Tr. 54, 67. She can shower and dress herself.  Tr. 55.  She does not go shopping or perform household chores.  Tr. 55.  She occasionally cooks.  Tr. 55.  On a typical day, her "biggest thing in the whole day is to make dinner," although sometimes when she is having a bad day she is unable to make dinner.  Tr. 56.  She loves to cook but her pain makes it hard for her to stand and to cut things.  Tr. 59.  The repetitive movements hurt her arm and on bad days she has problems gripping things.  Tr. 59.  She takes breaks a lot when she is cooking and she starts early.  Tr. 59. She sleeps a lot.  Tr. 56.  She isolates herself in her room.  Tr. 57.  When she is not sleeping she talks to her daughter on the phone.  Tr. 56.  She has no hobbies or activities, although she used to dance and enter online writing contests.  Tr. 56.  She belongs to no clubs.  Tr. 56.  She does not visit with friends or relatives, aside from the time she spends with her boyfriend and children in the home they share.  Tr. 57.

She has problems concentrating; she does not know whether this problem is from her medications or from a fibromyalgia fog.  Tr. 67.   She has problems with short term memory and

sometimes she will forget things on the stove.  Tr. 68.  She cannot follow television shows.  Tr. 51.  She is easily stressed and is also anxious and nervous.  Tr. 69.  She does not see a psychiatrist or a counselor.  Tr. 51.

Pacley has not worked since her car accident; she was on leave for nine months after the accident and then her doctor told her that there was "no way" she could go back to work because of her severe symptoms and told her to apply for disability.  Tr. 71.

### 2. Vocational Expert's Testimony

 Vocational Expert Robert Lavatmosel ("VE") testified at the hearing.  Tr. 72-78.  The ALJ discussed with the VE Pacley's past work as a general clerk, insurance clerk, receptionist, and telephone operator.  Tr. 73-74.  The ALJ asked the VE to determine whether a hypothetical individual of Pacley's age, education and work experience could perform the work she performed in the past or any other work if that person had the following characteristics: can perform work at the light exertional level, but cannot climb ladders, ropes or scaffolds; can occasionally climb ramps and stairs, balance, stoop, crouch and crawl; and can have no concentrated exposure to hazards, i.e., heights and machinery.  Tr. 74.  The VE answered that such an individual could perform Pacley's past work in addition to the following jobs: cashier II (500,000 national jobs, 25,000 Ohio jobs, 6,000 regional jobs); cafeteria attendant (200,000 national jobs, 8,000 Ohio jobs, 2,500 regional jobs); and inspector and hand packager (200,000 national jobs, 6,000 Ohio jobs, 1,500 regional jobs).  Tr. 74-75.

Next, the ALJ asked the VE whether the individual could perform work if that individual would be off task 20% of the time.  Tr. 76.  The VE answered that such an individual could not maintain work.  Tr. 76.  Pacley's attorney asked the VE if the jobs he previously identified would be available for an individual who would need to change position "every 15 minutes per hour."

Tr. 77. The VE answered that such an individual would not be able to perform the cafeteria attendant position but could perform other work, including Pacley's past relevant work. Tr. 77. Pacley's attorney asked the VE whether there would be jobs available to an individual who would miss approximately four days a month, and the VE replied that there would be no jobs. Tr. 78.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[3] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his August 24, 2015, decision, the ALJ made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.  Tr. 17.

2.      The claimant has not engaged in substantial gainful activity since March 27, 2013, the alleged onset date.  Tr. 17.

3.      The claimant has the following severe impairments: fibromyalgia, degenerative spurring with disc bulging of cervical spine, and history of undifferentiated connective tissue disease.  Tr. 17.

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 18.

5.      The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except she cannot climb

---

[3] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

ladders, ropes or scaffolds; can occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; cannot have concentrated exposure to temperature extremes, humidity or vibration; and cannot have any [] exposure to hazards, such as unprotected heights, dangerous machinery or commercial driving.   Tr. 19.

6.      The claimant is capable of performing her past relevant jobs of general clerk, insurance clerk, receptionist, and telephone operator.  These jobs did require the performance of work-related activities precluded [sic] by the claimant's residual functional capacity.  Tr. 20.

7.      Additionally, while the claimant is capable of performing past relevant work, there are other jobs existing in the national economy that she is also able to perform.  Therefore, the Administrate Law Judge makes the following alternative findings for step five of the sequential evaluation process.  Tr. 20.

8.      The claimant has not been under a disability, as defined in the Social Security Act, from March 27, 2013, through the date of this decision.  Tr. 21.

## V. Parties' Arguments

Pacley objects to the ALJ's decision on four grounds: the ALJ failed to evaluate whether her severe impairments met or equaled Listing 14.06; failed to evaluate all of Pacley's severe impairments when assessing her RFC; failed to evaluate Pacley's fibromyalgia in accordance with SSR 12-2p; and failed to comply with SSR 16-3p when he did not evaluate all of Pacley's medications.  Doc. 15, pp. 13, 24.[4]  In response, the Commissioner submits that the ALJ did not err when he evaluated her impairments and substantial evidence supports the ALJ's decision. Doc. 14, pp. 6-9.

## VI. Law

---

[4] Twice in her brief, Pacley references the ALJ's Step Two finding and then lists symptoms, without providing argument or supporting legal authority.  Doc. 15, pp. 13, 22.  "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."  *McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997) (internal citations omitted).  Moreover, the symptoms Pacley identifies appear to be symptoms of connective tissue disorder, fibromyalgia, and/or medication side effects, which the ALJ will consider on remand.

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## VII. Analysis

The ALJ's decision is woefully brief.  Thus, the undersigned cannot determine whether his decision is supported by substantial evidence.  For instance, regarding Pacley's undifferentiated connective tissue disease, which he found to be a severe impairment, the ALJ simply stated, at Step Three,

> The claimant has complained of diffuse body pain, and she has been given the diagnosis of undifferentiated connective tissue disease and fibromyalgia.  However, she was examined on January 23, 2013 and her notes report, "Has nonspecific joint pain and fatigue with family history of lupus. See no obvious signs or symptoms of a connective tissue disease" (Ex. 1F page 11).

Tr. 18.

This brief explanation does not provide a basis for the Court to conclude that the ALJ's decision is supported by substantial evidence.  First, the treatment note that the ALJ references (Tr. 228) is dated prior to Pacley's alleged onset date.  Second, the ALJ appears to discount Pacley's diagnosis of connective tissue disease in the passage cited above, yet he found it to be a

severe impairment.  These two findings are contrary to each other.  And the ALJ does not mention Dr. Hwang's April 2014 diagnosis of joint hypermobility syndrome, which is a connective tissue disease.  Third, the ALJ's brief description seemingly discounting Pacley's connective tissue disease does not reflect the requirements of Listing 14.06(B) (Undifferentiated connective tissue disorder), which the ALJ claims to have considered.  There is evidence in the record which, if credited, could show that Pacley meets or equals Listing 14.06(B).

Finally, the ALJ does not describe whether and/or what limitations that he assessed result from Pacley's connective tissue disorder.  His entire explanation of his RFC assessment is as follows:

> On January 22, 2014, Kelly Kopkowski, D.O. opined the claimant was capable of lifting 50 pounds occasionally (Ex. [5F] Pages 7-8).  She also reported the claimant had normal sensations, normal muscle strength, normal reflexes, normal capacities for fine and gross manipulative movements, and that the claimant required no cane (Ex. 5F pages 5-9).
>
> The reviewing state agency physician gave great weight to these opinions and findings and determined the claimant was capable of the full range of medium work with no exposure to industrial hazards (Ex. 2A).
>
> However, the undersigned gives some credence to the claimant's complaints and her capacity has been reduced to the light level, with the above limitations cited (SSR 96-6p).

Tr. 20.  There are a number of problems with the ALJ's explanation.  Dr. Kopkowski provided her opinion based on Pacley's cervical spine issues (which the ALJ also found to be a severe impairment), not her other severe impairments (connective tissue disease and fibromyalgia).  Next, the ALJ does not describe the weight he gave to Dr. Kopkowski's opinion or the opinion of the state agency physician.  Moreover, the ALJ asserts that the state agency reviewing physician gave "great weight" to Dr. Kopkowski's opinions, but this cannot be so because Dr. Kopkowski's opinion *postdates* the state agency reviewer's opinion.  Finally, although he stated that he gave "some credence" to Pacley's complaints, he does not identify *which* of Pacley's

rather severe and voluminous complaints he gave credence to and does not provide any credibility explanation in his decision, other than the following, stray comment: "Significantly, the claimant testified that her automobile accident is still in litigation."  Tr. 19.

The ALJ's consideration of Pacley's fibromyalgia fares no better.  At Step Three, the ALJ stated that he considered SSR 12-2p, which details how fibromyalgia is evaluated, and stated,

> Regarding fibromyalgia, the claimant was examined on May 25, 2014 by Dr. Yong Hwang, a Rheumatologist.  He found no motor or sensory deficits.  However, he concluded that the claimant "meets the criteria for fibromyalgia" due to her diffuse arthralgias, myalgia, and fatigue (Ex. 9F page 9).
>
> In contrast, the claimant was examined by Dr. Scott Burg, another Rheumatologist, on June 22, 2015 (Ex. 14F).  He reported she had normal lung and heart sounds.  He found no edema.  He reported the claimants muscle strength, sensations, and reflexes were all normal. He found a full range of motion in the cervical, thoracic, and lumbar spine.  He described the claimant's examination as "unremarkable" (Ex. 14F page 5).

Tr. 18-19.  The ALJ's explanation does not follow SSR 12-2p.  SSR 12-2p describes that fibromyalgia may be diagnosed by an accepted medical source (such as, presumably, Drs. Hwang and Burg).  SSR 12-2p, at *2.  Importantly, SSR 12-2p emphasizes that fibromyalgia "symptoms and signs ... may vary in severity over time and may even be absent on some days" and that "it is important that the medical source ... has access to longitudinal information about the person."  *Id.* at *5.  Here, Dr. Hwang opined that Pacley met the criteria for fibromyalgia. Dr. Burg saw Pacley once, had none of her records, and remarked that he needed Pacley's records to make further diagnoses.  Yet the ALJ attaches importance to the fact that Dr. Burg's examination findings were unremarkable, overlooking the fact that fibromyalgia patients often have normal examination findings and that longitudinal records are important.  In other words, the ALJ's explanation is directly contrary to SSR 12-2p.  *See also Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (an ALJ's brief analysis and over-emphasis on objective

findings are inappropriate when discussing a claimant's fibromyalgia: "it would be 'nonsensical to discount a fibromyalgia claimant's subjective complaints of pain based upon lack of objective medical evidence, as such evidence is generally lacking with fibromyalgia patients,'" quoting *Canfield v. Comm'r of Soc. Sec*., 2002 WL 31235758, at *1 (E.D. Mich. Sept. 13, 2002)). Furthermore, the ALJ did not describe whether and/or what limitations that he did include in his RFC assessment are derived from Pacley's fibromyalgia.  And he did not discuss Pacley's symptoms (e.g., pain, fatigue, insomnia), her treatment (including the medications she takes), or assess her credibility.  *See id.* ("given the nature of fibromyalgia, where subjective pain complaints play an important role in the diagnosis and treatment of the condition, providing justification for discounting a claimant's statements is particularly important," citing *Hurst v. Sec'y of Health & Human Servs*., 753 F.2d 517, 519 (6th Cir. 1985)).

Lastly, Pacley argues that the ALJ failed to consider her medications as required by SSR 16-3p.  Doc. 15, pp. 13, 24.  But SSR 16-3p was not effective until March 16, 2016, more than six months after the ALJ's decision.  The ALJ did not err by failing to follow SSR 16-3p.  To the extent that Pacley argues that the ALJ failed to consider her medications, the undersigned agrees that, given the longitudinal record of Pacley's numerous medications and possible side effects discussed (including upon direct questioning by the ALJ during the hearing), the ALJ should have considered Pacley's medications, and it is not clear that he did so.  *See* SSR 96-7p (when assessing the claimant's credibility, the ALJ considers medications and possible side effects).

In sum, the ALJ's decision is bereft of sufficient detail such that the undersigned cannot conduct a meaningful review of the ALJ's decision to determine whether it is supported by substantial evidence.  Accordingly, the ALJ's decision is **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.

## VIII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.[5]


Dated: June 30, 2017

Kathleen B. Burke
United States Magistrate Judge


## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

---

[5] This recommendation should not be construed as a recommendation that, on remand, Pacley be found disabled.